# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| POWELL STERN CAPITAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 18 C 7395 |
| | ) | |
| STANDLEY PLASTICS, INC. | ) | Judge Charles P. Kocoras |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant Standley Plastics, Inc.'s ("Standley") Motion to Dismiss Plaintiff Powell Stern Capital, Inc.'s ("Powell") Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is denied.

## BACKGROUND

The following facts are taken from Powell's complaint and assumed to be true for purposes of this motion. *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995). The Court draws all reasonable inferences in Powell's favor. *Tamayo v. Blagojevich*. 526 F.3d 1074, 1081 (7th Cir. 2008).

Powell is an Illinois corporation that is in the business of finding equity investors and lenders to secure capital for companies and itself. Standley is a Missouri corporation that manufactures compounds and composites using recyclable plastics,

with a specialty in cleaning, shredding, and pelletizing plastic liners involved in the processing of meat and poultry.

In May of 2017, Steven Bombola ("Bombola") – a consultant for Standley – engaged Powell to secure capital for Standley.[1] On December 3, 2017, the parties entered into a Consulting Agreement.[2] The Consulting Agreement, in relevant part, states that the Powell would use its "best efforts" to present Standley "with the opportunity to negotiate directly with potential equity investors and lenders [ ] for the purpose of obtaining an equity investment, debt, or any combination of the thereof ...." The Consulting Agreement provided that Powell would receive a consulting fee of five percent "of any monies received by [Standley], whether debt or equity, from a capital source introduced to [Standley] by [Powell]."

The Consulting Agreement also afforded Powell a "Right of Refusal." Specifically, Standley was required to "notify [Powell] promptly of any inquiries, proposals, or offers made by third parties" to Standley and "furnish [Powell] the terms thereof (including, without limitation, the type of consideration offered and the identity of the third-party)." Powell was also afforded "the right to match the terms of any proposed transaction in lieu of such parties." The Consulting Agreement also contemplated a cancellation provision, which stated that "[e]ither party has the right to

---

[1] Prior to the allegations giving rise to the present dispute, the parties had a previous relationship dating back to May of 2013. At that time, Powell had agreed to raise capital for Standley and devoted a substantial number of hours in conducting due diligence in its attempts to secure capital. However, Powell ultimately terminated this relationship upon its discovery that Standley's financials were "unreliable."
[2] The Consulting Agreement superseded the original Finder's Agreement, dated May 22, 2017.

2

cancel this agreement upon (45) days' written notice if it is deemed that appropriate progress has not been made towards the financing of the Transaction."

Powell subsequently devoted a substantial amount of time as part of its due diligence.[3] On or about September 27, 2017, Standley asked Powell to assemble a buyer's group to purchase Standley. To solidify this request, the parties executed a Letter of Intent ("LOI") on December 1, 2017.[4] The LOI confirmed the parties' "understanding … with respect to the principal terms and conditions under which [Powell] and its capital source will acquire 100% of the outstanding capital stock of [Standley] and all of its assets." The LOI contemplated two closings.

For the initial closing, "[Powell] propose[d] to invest or assist securing capital for the benefit of [Standley] in the initial amount of up to $11.5 million of debt and/or equity of [Standley]." Following the initial closing, the LOI afforded Powell with a 90-day option to purchase additional stock in Standley. Specifically, the LOI noted: "[f]or each $1 million advanced by [Powell] (in its sole discretion) (assuming no equity is secured by [Powell] as contemplated above), [Powell] shall receive an additional 1% in stock of SPI."

---

[3] Specifically, the Plaintiff notes that in July of 2017, Rob Powell and one of its experts, David Fennema, met with Steven Standley and Bombola in Missouri. There, Powell determined that Standley's timing for secured capital was unrealistic and its valuation of the company was inflated. Despite these issues, Powell diligently sought potential capital sources for Standley.

[4] The parties executed an initial Letter of Intent dated September 20, 2017, which was superseded by the Letter of Intent dated December 1, 2017.

Section 4 of the LOI addressed its binding effect. Section 4(a) states, "[e]xcept as provided in Section 4(b) below, this letter does not create, and is not intended to create any binding legal or contractual obligations on the part of either [Powell] or [Standley]." Section 4(b) states, notwithstanding 4(a), "Sections 1.3.5 and the Exclusive Stock Option of this Letter are intended to create binding legal and contractual obligations of the parties with respect to the matters set forth therein."

Section 1 states:

> Disclosures. The Debquity and Investment/Acquisition may be disclosed by [Standley] and/or [Powell] to (as applicable) their respective Boards of Directors, personnel, and legal, accounting and financial advisors on a "need-to-know" basis, but none of the parties nor their agents shall make any other disclosures of the Acquisition … without the prior written consent of the other party unless, in the opinion of either party's counsel, it is required by applicable law, regulation, judicial or administrative order to do so and the disclosing party promptly notifies the other party of such disclosure and the reason therefore. The parties will use reasonable efforts to cooperate with each other in making any disclosures as to the Acquisition."

Section 3 states:

> Exclusivity. [Standley] acknowledges that [Powell] will incur significant expense in connection with its due diligence review and preparation and negotiation of the Purchase Agreement. As a result, upon execution of this Letter, [Standley] shall terminate any existing discussions or negotiations with, and shall cease to provide information to or otherwise cooperate with, any party other than [Powell] … with respect to the Acquisition Transaction (as defined below). In addition, from and after the date hereof, [Standley] will [not] directly or indirectly encourage, solicit, initiate, have or continue any discussions or negotiations with or participate in any discussions or negotiations with or provide any information to or otherwise cooperate in any other way with, or

enter into any agreement, letter of intent or agreement in principle with, or facilitate or encourage any effort or attempt by any [entity] (other than [Powell]) concerning any merger, joint venture, recapitalization, reorganization, sale of substantial assets, sale of any shares of capital stock, investment, or similar transaction involving [Standley] (each, an "Acquisition Transaction"). [Standley] shall notify [Powell] promptly of any inquiries, proposals, or offers made by third parties to [Standley] with respect to an Acquisition Transaction and furnish [Powell] the terms thereof (including, without limitation, the type of consideration offered and the identity of the third party). [Standley] shall deal exclusively with [Powell] with respect to any possible Acquisition Transaction and [Powell] shall have the right to match the terms of any proposed transactions in lieu of such parties.

Section 5 states:

> Expenses. In the event that [Standley] abandons and/or terminates this Letter agreement with or without cause prior to execution of the Purchase Agreement as set forth herein, [Standley] will pay a break-up fee of one million Dollars ($1,000,000) to [Powell] … [Powell] and [Standley] shall each pay its own fees and expenses … with respect to the negotiations of the Purchase Agreement ….

Shortly thereafter, Powell alleges that Standley actively solicited offers from other investors. In April of 2018, Bombola allegedly informed Powell that Standley was in negotiations with an investor that was willing to put $3 million to $5 million into Standley. However, Standley failed to disclose the identity of this capital source nor provided Powell with any details so that it could make an informed decision on the right to match such offer. Powell subsequently learned that "Shift Capital" provided capital to and received equity from Standley. Powell also alleges that Standley used Powell as

5

a "Stalking Horse" bidder with other potential investors to increase its alleged purchase value, and that Standley failed to timely deliver the requested financial information.

On June 4, 2018, Powell sent a letter to Standley taking the position that Standley breached the LOI. On September 10, 2018, Standley sent a letter to Powell terminating the LOI and broker fee arrangement. About one month later, Powell demanded that Standley pay the $1 million break-up fee. In response, Standley told Powell that the "LOI/Acquisition Letter is still viable."

On November 7, 2018, Powell filed its two-count complaint against Standley. Count I alleges a breach of contract claim against Standley under the LOI, and Count II alleges a breach of contract claim under the Consulting Agreement. On January 7, 2019, Standley filed the instant motion, seeking dismissal of Counts I and II under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

## **LEGAL STANDARD**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in the complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs need not provide detailed factual allegations, but they must provide enough factual support to raise their right to relief above a speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A claim must be facially plausible, meaning that the pleadings must "allow…the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the…claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I. Breach of Contract Claims

#### A. Count I

As an initial matter, the parties agree that Missouri law applies to Count I, and the Court finds no reason to conclude otherwise. Therefore, the Court will apply Missouri law.

In Count I, Powell alleges Standley breached the LOI by misusing the LOI to seek a better deal, violating the exclusivity provision by negotiating behind Powell's back, and by providing Powell with misleading financials.[5] Standley contends that the

---

[5] Powell first argues in its response brief that the validity of a contract is a question for a jury, and not the Court. However, Missouri law unequivocally asserts that "[w]hen a party relies upon a writing or a number of writings to establish a contract, it is unquestionably the province of the court to determine from the writing or writings whether or not a contract was entered into." *Nelson v. Cal Hirsch & Sons' Iron & Rail Co.*, 102 Mo. App. 498, 77 S.W. 590, 594 (1903). Indeed, "[t]he burden of showing legally sufficient consideration on the party relying on the contract, and whether consideration is sufficient to establish a contract is normally a question of law for the court and not a question of fact for the jury." *Allison v. Agribank, FCB*, 949 S.W.2d 182, 184 (Mo. Ct. App. 1997); *See Shapiro v. Butterfield*, 921 S.W. 2d 649,

LOI is not a valid bilateral contract as contemplated by Missouri law because it lacks mutuality of obligations. We disagree.

To plead a breach of contract claim under Missouri law, Powell must allege "(1) competency of the parties to contract; (2) subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation."[6] *Birkenmeier v. Keller Biomedical, LLC*, 312 S.W.3d 380, 392 (Mo. Ct. App. 2010). Mutuality of obligation "means that an obligation rests upon each party to do or permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound." *Summers v. Service Vending Co., Inc.*, 102 S.W.3d 37, 41 (Mo. App. S.D. 2003). An agreement is illusory and unenforceable if one party can unilaterally modify the agreement such that the party could relieve itself of its promises. *Seay v. Jones*, 439 S.W.3d 881, 891 (Mo. App. W.D. 2014); *See Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 776 (Mo. 2014) ("A promise is illusory when one party retains the unilateral right to amend the agreement and avoid its obligation.").

---

651-52 (Mo. Ct. App. 1996) (affirming dismissal of contract claim where plaintiff "failed to allege any mutual obligations placed upon [her] and failed to establish that any legal consideration ran from her to [defendant]")

Powell also contends that the mutuality of obligation element is no longer valid under Missouri law. While Missouri has adopted the Restatement Second of Contract approach, Standley correctly asserts that Missouri law continues to recognize mutuality of obligation as an essential element of an enforceable contract. *See Ramirez-Leon v. GGNSC, LLC*, 553 S.W.3d 318, 323 (Mo. Ct. App. 2018) ("The essential elements of a contract are … (4) mutuality of agreement; and (5) mutuality of obligation.") (internal quotations omitted); *see also Mayer Hoffman McCann, P.C. v. Barton*, 614 F.3d 893, 904 n. 19 (8th Cir. 2010) ("Although Missouri has adopted the Restatement approach, even recent Missouri cases continue to recite mutuality of obligation as a prerequisite to an enforceable contract.") (internal citations omitted).

[6] The sole issue this Court must decide is whether Powell has adequately pled "mutuality of obligation."

However, Missouri law tends to "uphold the contract by finding the promise was not illusory when it appears that the parties intended a contract." *Magruder Quarry & Co. v. Briscoe,* 83 S.W.3d 647, 650 (Mo.App.E.D. 2002). "Frequently a court will find an apparently illusory promise to be accompanied by an implied promise to use 'best efforts' or 'reasonable efforts.'" *Id.* Consequently, "an implied obligation to use good faith is enough to avoid finding a contract null and void due to an illusory promise. *Id.* at 651. We find that is the case here.

In such an arrangement, there is an implied promise of good faith to impose an obligation on Powell to make reasonable efforts in securing equity for Standley. Indeed, Powell has alleged that it expended time, effort, and capital with countless hours in due diligence, retaining experts, contacting funding sources, and studying the economic feasibility for the LOI. On the other hand, there is an implied promise of good faith to impose an obligation on Standley to adhere to the terms set forth in the LOI. Powell has alleged that Standley misused the LOI to seek a better deal from another firm, negotiated behind Powell's back, provided Powell with inaccurate financial statements, and unilaterally terminated the LOI without paying the agreed upon $1 million break-up fee. Based on our review of the LOI, we do not find that Section 4 articulates any language to negate this implied covenant of good faith. Accordingly, we find such an obligation is implied, thereby creating mutuality of obligation. Thus, Count I is not dismissed.

## B. Count II

As an initial matter, the parties agree that Illinois law applies, and there is no reason for the Court to conclude otherwise. Therefore, the Court will apply Illinois law to Count II.

In Count II, Powell alleges that Standley breached the Consulting Agreement by breaching the right to first refusal provision and terminating the Consulting Agreement without adequate notice.

To adequately plead a breach of contract claim under Illinois law, Powell must establish: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resulting injury to the plaintiff." *Applied Indus. Material Corp. v. Mallinckrodt, Inc.*, 102 F. Supp. 2d 934, 937 (N.D. Ill. 2000) (citing *Gallagher Corp. v. Russ*, 309 Ill. App. 3d 192 (1999)).

### i. The Right of First Refusal

Standley first contends that Powell inadequately pled that they breached the right of first refusal provision. We disagree.

Powell has plead that Standley breached the Consulting Agreement "by circumventing [Powell] with another capital lender without first notifying [Powell] and obtaining [Powell's] approval," by not timely "providing accurate information," and by "failing to grant a right refusal to [Powell] concerning additional capital to [Powell] and for the purchase of any portion of [Standley]." Drawing all reasonable inferences in Powell's favor, Powell has reasonably pled that Consulting Agreement required

Standley to place Powell on notice of any deals before the deals were closed so Powell could exercise its right of first refusal.  Indeed, Stanley failed to demonstrate any good faith in upholding the Consulting Agreement.  As a result, Powell was prevented from exercising its first of right refusal.  Accordingly, Standley's motion is denied.

### ii. Timing of Standley's Termination

Powell next argues that Standley breached the Consulting Agreement when it immediately terminated the Consulting Agreement without adequate notice.  The Consulting Agreement states that "[e]ither party has the right to cancel this agreement upon (45) days' written notice if it is deemed that appropriate progress has not been made towards the financing of the Transaction."  Powell has plead that Standley "immediately terminat[ed] the Agreement on September 10, 2017[,] without the required forty-five days' notice."  Powell has adequately plead that Standley failed to adhere to the required forty-five days' notice provision.  Accordingly, Standley's motion with respect to the timeliness of its termination is denied.

### CONCLUSION

For the aforementioned reasons, the Court denies Standley's motion.  It is so ordered.

_Charles P. Kocoras_

Dated: 9/16/2019

Charles P. Kocoras
United States District Judge